IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SOLO CUP COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 C 4384 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Geraldine Soat Brown |
| FIRST SOUTHWEST VENDING AND | ) | |
| FOOD SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this action plaintiff Solo Cup Company ("Solo") is suing defendant First Southwest Vending and Food Service ("Southwest") for breach of a cafeteria lease agreement, and is also seeking a related declaratory judgment. Southwest has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. ("Def.'s Mot.") [Dkt 12.] For the following reasons, Southwest's motion is granted. This action is dismissed without prejudice for lack of personal jurisdiction.

**PROCEDURAL BACKGROUND**

Solo's Complaint alleges that it is a Delaware corporation with its principal place of business in Highland Park, Illinois, and that Southwest is an "entity existing under the laws of Texas" with

1

a principal place of business in Trophy Club, Texas. (Compl. ¶¶ 1-2.) [Dkt 1.][1] The Complaint alleges breach of a cafeteria lease agreement dated May 14, 2004 ("Agreement") in which Southwest agreed to operate a cafeteria in Solo's Dallas manufacturing facility. (Compl. ¶9, Ex. A.)

Southwest filed the present motion including the affidavit of Gail Ross, the President of Southwest who signed the Agreement. (Def.'s Mot., Ex. A, Ross Aff. ¶ 1.) Solo took discovery on the motion, including Ms. Ross's deposition, and filed a response to the motion including declarations by Tom Pasqualini, Solo's Executive Vice-President for Supply Chain who signed the Agreement on behalf of Solo, and Marty Verville, the Human Resource Manager at Solo's Dallas facility. (Pl.'s Resp., Ex. A, Pasqualini Dec. ¶¶2, 4; Ex. B, Verville Dec. ¶ 2, 4.) [Dkt 32.][2] The parties consented to the jurisdiction of a Magistrate Judge. **[**Dkt 15.**]** The court heard argument by counsel on the motion. [Dkt 36.]

---

[1]Solo premises federal subject matter jurisdiction in this case on the diversity of the parties pursuant to 28 U.S.C. § 1332. (Compl. ¶¶ 4, 5.) Solo's allegations as to Southwest's citizenship are limited to the following: "On information and belief, defendant First Southwest Vending and Food Service . . . is an entity existing under the laws of Texas with a principal place of business at 1 Village Trail, Trophy Club, Texas, 76262." (Compl. ¶ 2.) Southwest admits that allegation in its answer filed as part of and subject to its motion to dismiss. (Answer ¶ 1.02.) It is unclear from the pleadings whether Southwest is a corporation or some other "entity" that may require further allegations about citizenship. Because dismissal for lack of personal jurisdiction is warranted here, however, the court need not conclusively determine the existence of federal subject matter jurisdiction. *Sinochem International Co. Ltd, v. Malaysia International Shipping Corp*., _____U.S. _____, 127 S.Ct. 1184, 1191 (2007)(stating that "a court may dismiss for lack of personal jurisdiction without first establishing subject-matter jurisdiction," citing *Ruhrgas AG v Marathon Oil Co*., 526 U.S. 574 (1999)).

[2]Portions of Ms. Ross's deposition are attached as exhibits to both Solo's Response [dkt 32] and Southwest's Reply [dkt 33]. Although neither exhibit contains a complete transcript, this opinion refers to the excerpts collectively as the Ross deposition.

## FACTUAL BACKGROUND

In early 2004, Ms. Ross, Southwest's President, contacted Mr. Verville about submitting a quote for Southwest to operate vending machines at the Sweetheart Cup facility in Dallas, Texas. (Ross Dep. at 33.) Initially, Southwest's negotiations were with Sweetheart, but by the time the Agreement was signed, Ms. Ross was aware that the other party was Solo. (Ross Dep. at 35-36.) The record on the motion contains virtually no information about the relationship between Sweetheart and Solo, except a copy of the 2003 Texas Franchise Tax Report for Sweetheart Cup, identifying its principal place of business as Maryland, and documents from the Delaware and Texas Secretaries of State showing that in 2005, Sweetheart Cup Company, Inc., a Delaware corporation, changed the name under which it operates to "Solo Cup Operating Corporation." (Def.'s Reply, Ex. B.) However, it is undisputed that Southwest's negotiations began with Sweetheart Cup and ended in an agreement with Solo.

Ms. Ross and Mr. Verville conducted all of the negotiations over the proposed agreement, initially by telephone and then in Mr. Veville's office in Dallas, Texas. (Ross Dep. at 35; Ross Aff. ¶ 4.) Ms. Ross states that at no time during the negotiations did she have any contact or communication with anyone at Solo in Illinois. (Ross Aff. ¶ 4.) Solo presents no evidence to the contrary.

Southwest's attorney drew up a draft lease agreement, which Southwest provided to Solo. (Ross Dep. at 34-35.) Ms. Ross testified that she executed the Agreement on behalf of Southwest in May 2004, in Solo's office in Dallas, Texas. (*Id.* at 33-37.) At the time she signed it, it was already signed on behalf of Solo. (*Id.* at 36.) Mr. Verville made a copy of the signed Agreement, which he gave to her. (*Id.* at 37-38.) Mr. Verville's affidavit has a slightly different story. He states

that on or around May 14, 2004, he received a copy of Agreement signed by Mr. Pasqualini on behalf of Solo, and that someone picked up a copy for Southwest at Ms. Ross's request. (Verville Dec. ¶¶ 3, 4.) Mr. Verville denies that Ms. Ross signed the Agreement on Solo's property. (*Id.* ¶ 5.) There is no suggestion, however, that Ms. Ross or anyone else on behalf of Southwest traveled to Illinois to negotiate or execute the Agreement. Mr. Pasqualini states that he executed the Agreement at Solo's headquarters in Illinois. (Pasqualini Dec. ¶ 4.) Mr. Pasqualini does not state that the Agreement was signed on behalf of Southwest when he received it. The Agreement attached to Solo's Complaint has a signature on behalf of Solo, but it is not signed on behalf of Southwest. (Compl., Ex. A.)

Under the Agreement, Southwest was to finish, furnish and operate a cafeteria in Solo's Dallas facility, as well as have the exclusive right to place vending machines in that facility. (Agreement ¶¶ 3,12.) Southwest would not pay rent or other monetary consideration for the lease, but would provide Solo's employees with coffee and one free meal for every ten purchased. (*Id.* ¶ 2.) Southwest would also pay Solo 15% of the net profits from vending machines in the facility. (*Id.* ¶ 12.) The Solo plant controller was to meet with a Southwest representative "monthly to review an accounting or financial statement for the purpose of confirming the amount of net profits from the vending machines." (*Id.* ¶ 12.) Mr. Verville states that if Southwest had paid royalties "due under the Agreement," Southwest would have been directed to send payments to Solo's corporate headquarters in Illinois for deposit in Solo's bank account in Illinois. (Verville Dec. ¶ 6.) The Agreement, however, is silent as to where any vending machine payments were to be made or sent. Southwest never made any payments to Solo. (Ross Dep. at 55.)

The Agreement provides for the application of Texas law (Agreement ¶ 26), and contains a

4

clause stating that the Agreement embodies the "entire agreement between the parties" and "supersedes all prior agreements and understandings . . . ." (*Id.* ¶ 22).

All equipment for the cafeteria was purchased in Texas. (Ross Dep. at 54-55.) All of Southwest's communications and meetings with Solo prior to execution of the Agreement took place in Texas. (Ross Aff. at ¶ 4.)

Claiming that Southwest breached various provisions of the Agreement, Solo sent Southwest a notice of default in March 2006. (Compl. ¶ 22.)[3] Southwest's attorney responded by letter dated April 6, 2006, directed to both Mr. Verville in Dallas and to Barry White, Solo's Vice President of Human Resources in Highland Park, Illinois. (Pf.'s Resp., Ex. F.) Solo terminated the Agreement in June 2006, and in August 2007 filed this lawsuit in the U.S. District Court for the Northern District of Illinois on the basis of diversity jurisdiction. (Compl. ¶ 24.)

Asserting that it is a nonresident defendant with insufficient ties to Illinois, Southwest challenges the personal jurisdiction of this court pursuant to Fed. R. Civ. P. 12(b)(2). (Def.'s Mot. at 2.) Solo argues that Southwest's activities fall within the Illinois long-arm statute, and that the exercise of specific jurisdiction over Southwest comports with both federal and Illinois due process.

## DISCUSSION

**A.     Rule 12(b)(2)**

Rule 12(b)(2) permits a court to dismiss a complaint for "lack of personal jurisdiction." To successfully oppose a Rule 12(b)(2) motion, a plaintiff bears the burden of demonstrating that the court has personal jurisdiction over the nonresident defendant. *RAR, Inc. v. Turner Diesel, Ltd.*, 107

---

[3]The record does not include a copy of Solo's notice of default.

F.3d 1272, 1276 (7th Cir. 1997). The nature of the plaintiff's burden depends on whether the court determines that an evidentiary hearing is necessary. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). The court may review affidavits submitted by the parties, without an evidentiary hearing, to determine if the plaintiff has made out a prima facie showing of personal jurisdiction. *Id.* At that preliminary stage, the plaintiff is entitled to resolution of all relevant disputed facts in its favor. *Id.* If, however, any material facts are disputed, the court must hold an evidentiary hearing to resolve those facts. *Hyatt Intl. Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002).

In this case, there are no material facts in dispute. As discussed below, the only factual disputes the parties have identified relate to whether Southwest executed the Agreement at Solo's Dallas facility or some other location in Texas, and when Southwest executed the Agreement. Those disputes are not material to the motion, and no evidentiary hearing is necessary.

**B.     Personal Jurisdiction**

In cases where federal jurisdiction is based on diversity of citizenship, a federal court in Illinois may exercise personal jurisdiction over a nonresident defendant only to the extent an Illinois court would have jurisdiction. *Heritage House Rests., Inc. v. Continental Funding Group, Inc.*, 906 F.2d 276, 279 (7th Cir. 1990). To determine whether personal jurisdiction exists, Illinois courts must consider whether the assertion of jurisdiction comports with Illinois' long-arm statute, the due process provision of the United States Constitution and the constraints imposed by the Illinois Constitution's due process provision. *Rollins v. Ellwood*, 565 N.E.2d 1302, 1314 (Ill. 1990).

Solo does not assert that Southwest has the continuous and systematic contacts with Illinois

that would give rise to general jurisdiction in Illinois. (Pl.'s Resp. at 5 n.1.) Rather, Solo asserts that there is specific jurisdiction, "a more limited assertion of state power, in which personal jurisdiction exists for controversies that arise out of or are related to the defendant's forum contacts." *Hyatt Intl.*, 302 F.3d at 713 (citing *Steel Warehouse of Wisc., Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1988).

Under Illinois' long-arm statute, nonresident defendants are subject to personal jurisdiction here if the cause of action arose from or relates to their activities within the state, including "[t]he making or performing of any contract or promise substantially connected with this State." 735 Ill. Comp. Stat. § 5/2-209(a)(7). Illinois' long-arm statute also contains a "catch-all" provision allowing Illinois state courts to assert personal jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 Ill. Comp. Stat. § 5/2-209(c). Although the United States and Illinois Constitutions do not contain identical due process guarantees, the Seventh Circuit has suggested that "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction." *Hyatt Intl.*, 302 F.3d at 715 (citing *RAR*, 107 F.3d at 1276). Thus, the standard is the limit imposed by the due process guarantee of the Fourteenth Amendment, that is, the federal due process inquiry. *See Hyatt Intl.*, 302 F.3d at 714.

To satisfy federal due process, the defendant must have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Intl. Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (internal quotations omitted). Those minimum contacts must be sufficient to create a "substantial connection" between the defendant and the forum state. *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987). "Crucial to the minimum contacts analysis is showing that the defendant should reasonably

7

anticipate being haled into court [in the forum State] . . . because the defendant has purposefully avail[ed] itself of the privilege of conducting activities there." *RAR*, 107 F.3d at 1277. The "purposeful availment" requirement ensures that "a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). Unilateral activity on the part of the plaintiff is not sufficient to support a finding of minimum contacts. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

If the defendant is found to have established minimum contacts with the forum state, the court then evaluates whether the exercise of jurisdiction would comport with "fair play and substantial justice." *Purdue*, 338 F.3d at 781 (quoting *Intl. Shoe*, 326 U.S. at 320). In that analysis, the court considers several factors, including "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)) (internal quotations omitted).

Southwest's motion is evaluated in light of those standards.

### 1. Southwest's Contacts with Illinois

Solo argues that this court has specific jurisdiction over its breach of contract claim against Southwest. Although a contractual relationship can sometimes establish specific jurisdiction, "an out-of-state party's contract with an in-state party is alone not enough to establish the requisite

8

minimum contacts." *RAR*, 107 F.3d 1277 (citing *Burger King*, 471 U.S. at 478). "Rather, 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' must indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant." *Id.* (quoting *Burger King*, 471 U.S. at 479).

Accordingly, to determine whether the contractual relationship between Southwest and Solo is sufficient to establish personal jurisdiction, several factors must be considered: (1) who initiated the transaction; (2) where the contract was entered into; (3) where the performance of the contract was to take place. *Viktron Ltd. Partn. v. Program Data, Inc.*, 759 N.E.2d 186, 193-194 (Ill. App. 2001). Furthermore, "[a] fourth factor, where the contract was negotiated . . . is clearly relevant." *Id.* [4]

Here, it is undisputed that when Southwest initiated negotiations, it did so with the Sweetheart Cup Company, a Delaware corporation. After some unspecified period of time Southwest learned that Solo had in some fashion replaced the Sweetheart Cup Company and that Solo would be the contracting party. The negotiations proceeded entirely in Texas even after Solo became involved -- a point Solo effectively concedes. If a defendant solicits an agreement through

---

[4] In *Viktron*, the court enumerated these factors when evaluating whether the contract at issue was substantially connected with Illinois sufficient to confer personal jurisdiction under Illinois' long-arm statute. 759 N.E.2d at 193-194. Courts in Illinois and in this district have routinely applied these factors in evaluating whether a court could exercise jurisdiction under Illinois' long-arm statute. *See e.g. Crum & Forster Specialty Ins. Co. v. Extended Stay America, Inc.*, 873 N.E.2d 964, 970 (Ill. App. 2007); *Bolger v. Nautica Intl., Inc.*, 861 N.E.2d 666, 671 (Ill. App. 2007); *BAB Systs., Inc. v. UNK, Inc.*, 2002 WL 31867705 *2 (N.D. Ill. Dec 20, 2002) (Coar, J); *Promero, Inc. v. Mammen*, 2002 WL 31455970 *4 (N.D. Ill. 2002) (Guzman, J.). Although formulated within the framework of Illinois' long-arm statute, these factors are helpful in analyzing whether the parties' contractual relationship and course of dealings are sufficient to establish the requisite minimum contacts under federal due process. *See e.g. Citadel Group Ltd. v. Wash. Regl. Med. Ctr.,* 2007 WL 1772262 *3 (N.D. Ill. June 18, 2007) (Aspen, J.); *Lakeview Tech. v. Vision Solutions*, 2007 WL 79246 * 7 (N.D. Ill. Jan. 9, 2007) (Aspen, J.).

contact with the plaintiff in the forum state, that is a factor favoring jurisdiction. *See Madison Consulting Group v. State of South Carolina*, 752 F.2d 1193, 1203-1204 (7th Cir. 1985). But that is not the case here. At no time did any Southwest representative travel to Illinois or have any contact or communication with any representatives of Solo in Illinois during the negotiation of the Agreement. It cannot be said that Southwest purposefully approached an Illinois corporation, or that upon learning of Solo's involvement in the transaction, directed its discussions to Illinois or any Solo representative in Illinois. *See e.g. Smith Wilson Co., Inc. v. Metro Airlines, Inc.*, 1987 WL 26114 * 4 (N.D. Ill. Nov. 30, 1987) (Plunkett, J.) (no personal jurisdiction in Illinois where defendant learned that plaintiff was an Illinois entity only after defendant submitted its bid).

As for execution of the Agreement, it is undisputed that Ms. Ross signed the Agreement on behalf of Southwest in Texas, not Illinois. While the parties dispute when Ms. Ross signed the Agreement, whether the copy she signed had already been signed by a Solo representative, and whether she signed the Agreement at Solo's Dallas facility or some other location in Texas, these issues of fact are not material to the motion. That Mr. Pasqualini executed the Agreement on behalf of Solo in Illinois is also insignificant. The defendant's actions, not the plaintiff's, determine jurisdiction. *See Asset Allocation & Mgt. Co., v. Western Employees Ins. Co.*, 892 F.2d 566, 569 (7th Cir. 1989) (stating that "[t]he question is whether [the defendant] was transacting business in Illinois, not whether [the plaintiff], the Illinois resident, was").

Performance of the Agreement also took place in Texas. The facility that is the subject of the lease arrangement is located in Dallas, Texas. Southwest was obligated under the Agreement to finish, furnish and maintain a cafeteria space as well as stock and maintain vending machines at the Dallas facility. Equipment for the cafeteria was purchased in Texas, and all personnel were

located in Dallas. Southwest's communications with Solo during the term of the Agreement were conducted with Solo representatives in Texas. Finally, the alleged breach of the Agreement– Southwest's alleged failure to provide a first class, professional cafeteria – necessarily took place at the leased premises in Dallas. (Compl. ¶ 12.)

While conceding that part of the Agreement was to be performed in Texas, Solo argues that part was also to be performed in Illinois. (Pl.'s Resp. at 7.) According to Solo, had Southwest complied with its obligation to pay Solo 15% of vending machine revenues, Southwest would have been directed to send payments to Solo's headquarters in Illinois, and Solo would have deposited those payments into Solo Cup's Illinois bank account. (*Id.* at 7.) Nothing in the Agreement, however, directs Southwest to mail any payments to Solo's Illinois headquarters. The Agreement merely states that Solo's "representative (Plant Controller)" is to meet with a Southwest representative on a monthly basis to review an accounting or financial statement for the purpose of confirming the amount of net profits from the vending machines. (Agreement ¶ 12.) The only reasonable construction of the phrase "plant controller" is as a reference to Solo's Dallas facility where the cafeteria was located. Nothing in the Agreement even requires that notices be sent to Solo in Illinois. Notices are to be provided "to the party's last known address." (Agreement ¶17.) In fact, the word "Illinois" does not appear in the Agreement.

Solo also argues that Southwest's attorney's letter in response to Solo's March 2007 notice of default, which was sent to Solo's Vice President of Human Resources in Illinois as well as to Mr. Verville in Texas, establishes that Southwest understood Solo's Illinois headquarters was the "appropriate locale to address and resolve . . . Southwest's performance issues and other potential contract interpretation issues." (Pl.'s Resp. at 7, referring to Ex. F.) Solo has not cited any legal

authority for the proposition that sending a copy of a response to a notice of default to Illinois subjects the sender to personal jurisdiction in Illinois, and the court is not aware of any. An attorney's response to a default letter hardly constitutes activity by which Southwest "purposefully availed itself of the privilege of conducting activities within the forum state." *Purdue Research*, 338 F.3d at 780 (citing *Burger King*, 471 U.S. at 475, and *Hanson v. Denckla*, 357 U.S. 235 at 253 (1958); *see also Asset Allocation*, 892 F.2d at 570 (nonresident defendant's mailing of checks in payment of contract and letters of complaint directed to plaintiff in Illinois were insufficient to confer jurisdiction, and stating that "[i]f those dealings are enough to confer jurisdiction, the long-arm statute reaches every contract with an Illinois resident").

In addition to the foregoing, the parties' choice of law provision contained in the Agreement factors into the analysis. While alone insufficient to confer jurisdiction, the choice of law provision is a relevant consideration in establishing jurisdiction. *Estate of Isringhausen v. Prime Contractors and Assocs., Inc.*, 883 N.E. 2d 594, 601 (Ill. App. 2008) (stating that "[p]]resumably, the choice-of-law provision is relevant because foreseeability on the defendant's part is central to the determination of whether personal jurisdiction would be reasonable and fair under the circumstances"). That the parties selected Texas law to govern the Agreement weighs against finding jurisdiction in Illinois.

These facts demonstrate that Southwest did not have the requisite minimum contacts nor has it created a substantial connection with Illinois "such that the maintenance of the suit [would] not offend traditional notions of fair play and substantial justice." *Intl. Shoe Co.*, 326 U.S. at 316 (internal quotations omitted). Solo has failed to demonstrate that Southwest "purposefully avail[ed] itself of the privilege of conducting activities" in Illinois so that it could reasonably anticipate being haled into court here. *Steel Warehouse*, 154 F.3d at 714.

## 2. Fairness

Additionally, the exercise of jurisdiction by a court in Illinois would not comport with "fair play and substantial justice." *Purdue*, 338 F.3d at 781 (quoting *Intl. Shoe*, 326 U.S. at 320). The burden on Southwest of proceeding with litigation in Illinois is substantial. The subject of this lawsuit – the leased premises – is located in Texas, all of Southwest's employees and potential witnesses are in Texas, and presumably all of Southwest's documents relevant to this lawsuit are located in Texas.

Solo counters that not all witnesses are located in Texas, and *its* documents are at Solo Cup's headquarters in Highland Park, Illinois. The only witness Solo identifies in Illinois, however, is Mr. Pasqualini, and his involvement in the dispute is limited to Solo's execution of the Agreement. (Pasqualini Dec. ¶ 4.) He was not even involved in the negotiation, and, as far as this record discloses, has no evidence on the central issue: whether the Agreement was breached. Solo further argues that requiring Southwest to appear in Illinois is not unduly oppressive or burdensome because Southwest has retained local counsel and modern developments and advancements in technology make it reasonable for parties to litigate in a foreign forum. (Pl.'s Resp. at 8.) But Solo could presumably just as readily retain local counsel and employ modern technology to litigate this lawsuit in Texas.[5]

The negotiation, execution, performance and alleged breach of the Agreement occurred

---

[5] In October 2007, shortly after the filing of this lawsuit, Southwest filed a parallel lawsuit against Solo in Texas state court alleging, *inter alia*, breach of the Agreement. Solo removed the lawsuit to the U.S. District Court for the Northern District of Texas on the basis of diversity jurisdiction, where the action has been stayed pending this court's ruling on Southwest's motion to dismiss. *First Southwest Vending and Food Serv. v. Solo Cup Co.*, 2008 WL 1757822 * 6 (N.D. Tex. Apr. 9, 2008) (Fitzwater, C.J.).

outside of Illinois, and this state has no interest in adjudicating the dispute, which will by governed by Texas law. It would be neither convenient nor efficient to resolve the parties' dispute in this forum.

## CONCLUSION

For the foregoing reasons, Southwest's motion to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction is granted, and this case is hereby dismissed without prejudice.

**IT IS SO ORDERED.**

_____
Geraldine Soat Brown
United States Magistrate Judge

July 17, 2008